| | AUSA: | John K. Neal | Telephone: | (313) 670-7539 |
|---|---|---|---|---|
| AO 91 (Rev. 11/11) Criminal Complaint | Special Agent: | Matthew R. Sluss | Telephone: | (313) 919-1327 |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| United States of America | | Case: 2:20–mj–30184 |
|---|---|---|
| v. | | Assigned To : Unassigned |
| | Case No. | Assign. Date : 6/1/2020 |
| Darrell Lamont Baker | | Description: RE: SEALED MATTER (EOB) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 13, 2020 - present__ in the county of __Wayne__ in the __Eastern__ District of __Michigan__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire fraud |
| 18 U.S.C. § 1957 | Money laundering |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
Complainant's signature

Matthew R. Sluss, Special Agent, FBI
Printed name and title

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: June 1, 2020

_____
Judge's signature

City and state: Detroit, MI

David R. Grand, U.S. Magistrate Judge
Printed name and title

# AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Matthew Sluss, Special Agent of the Federal Bureau of Investigation (FBI), being duly sworn, state that:

## INTRODUCTION AND AGENT BACKGROUND

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. I am empowered to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code.

2. I have been employed by the FBI as a Special Agent since September 2017. During my employment with the FBI, I have investigated federal crimes including mail fraud, wire fraud, bank fraud, bankruptcy fraud, and various other criminal matters. At all times during the investigation described in this affidavit, I have been acting in an official capacity as a Special Agent of the FBI.

3. This affidavit is made in support of a criminal complaint and summons to appear for DARRELL LAMONT BAKER for violating 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1957 (money laundering).

4. This affidavit is submitted for the limited purpose of securing a criminal complaint and summons to appear; therefore, this affidavit does not contain every fact that I have learned during the course of the investigation. I have only set forth the facts necessary to establish probable cause to believe that BAKER violated the

statutes identified above. The information contained in this affidavit is based upon my personal knowledge, training and experience, as well as the combined knowledge, training and experience of other law enforcement officers and agents with whom I have had discussions.

5.     18 U.S.C. §1343 criminalizes schemes or artifices to defraud, or obtaining money or property by means of false or fraudulent pretenses, representations, or promises, when for the purpose of executing the scheme, the person transmits, or causes to be transmitted, any writings, signs, signals, pictures, or sounds by means of wire communication in interstate commerce.

6.     18 U.S.C. §1957 makes it a crime to knowingly engage, or attempt to engage, in a monetary transaction with proceeds of a specified unlawful activity in an amount greater than $10,000 by, though, or to a financial institution.

## BACKGROUND OF THE PAYCHECK PROTECTION PROGRAM

7.     The Small Business Administration (SBA) defined a Paycheck Protection Program (PPP) loan as an SBA loan that helps businesses keep their workforce employed during the Coronavirus (COVID-19) crisis. These loans are designed to provide a direct incentive for small businesses to keep their workers on the payroll, for businesses that were in operation as of February 15, 2020. The SBA will forgive the loans if all employees are kept on the payroll for eight weeks and the money is used for payroll, rent, mortgage interest, or utilities. The loans are funded by any

participating federally insured depository institution or federally insured credit union. Some applications to participate in the program are made directly to the lender.

## PROBABLE CAUSE

8.  On May 13, 2020, MA, Director of Risk Management at MICHIGAN FIRST CREDIT UNION (MFCU), Southfield, Michigan, informed the FBI that BAKER fraudulently applied for a PPP loan on behalf of MOTORCITY SOLAR ENERGY, INC. (MOTORCITY). The $590,900 PPP loan was funded by an ACH wire transfer from CUSTOMERS BANK, in Pennsylvania, to MOTORCITY's MFCU, in Michigan, account on May 11, 2020.

9.  On May 15, 2020, KM, Fraud Investigator at CUSTOMERS BANK, was interviewed by your affiant. BAKER applied for a PPP loan on behalf of MOTORCITY, and the online application came through READY CAPITAL, an application processing vendor located in New Jersey. The submitted application included a copy of BAKER's driver's license and MOTORCITY's four 2019 941s, "Employer's Quarterly Federal Tax Return". The note date of the loan was May 4, 2020 and it was funded directly by ACH to MFCU in the amount of $590,900.

10. KM provided your affiant with BAKER's complete PPP loan application, which I have reviewed.

11.    The loan application asserted a primary business address of 220 Bagley, Suite 514, Detroit, Michigan 48226. I have observed that this location appears to be a multi-level office building located in downtown Detroit, Michigan, and MOTORCITY was not listed on the bulletin board directory in the lobby of the building. There was no MOTORCITY signage observed at the building, including on or around the fifth-floor door displaying the numbers 514. I have also learned that the address of 220 Bagley was not included on any of the incorporation documents found on the State of Michigan's License And Regulatory Affairs "corporation lookup" website.

12.    The four 2019 941s included with the loan application asserted MOTORCITY's address as 11397 Stockwell Street, Detroit, Michigan. I have observed this address to represent a single-family residence.

13.    The application and four 2019 941s asserted MOTORCITY to have 68 employees and 2019 annual wages, tips, and other compensation of approximately $2.8 million.

14.    I have learned that as of April 21, 2020, the State of Michigan's License And Regulatory Affairs corporation lookup website indicated the State of Michigan dissolved MOTORCITY's corporation status on July 15, 2019.

15.    On May 26, 2020, I reviewed Michigan's Unemployment Insurance Agency's webpage on Michigan.gov and obtained certain background information

about employers' obligations under Michigan's unemployment insurance program. Unemployment insurance is a form of social insurance, administered by Michigan's Unemployment Insurance Agency. It is designed to provide unemployment benefits to help workers replace some of their lost wages after they have become unemployed through no fault of their own, such as by a layoff. Michigan employers are required to file Employer's Quarterly Wage/Tax Reports listing their employees and the wages earned for each quarter. A quarterly report must be filed even if the employer does not have any employees and/or wages to report for the quarter. Employer's Wage/Tax Reports must be filed online through the Michigan Web Account Manager (MiWAM) account.

16. Further, the State of Michigan, Department of Attorney General, Labor Division, Regulatory Section, Payroll Fraud Enforcement Unit informed the FBI that there was no Michigan Unemployment Insurance Agency account registered for MOTORCITY.

17. According to corporation documents filed with the State of Michigan, BAKER was the resident agent for MOTORCITY, with a street address 11397 Stockwell Street, Detroit, Michigan. MOTORCITY was listed with a registered office mailing address of 4000 Chatsworth Street, Detroit, Michigan, and BAKER was listed as the President, Treasurer, Secretary, and Director with the same address.

18. I have observed 4000 Chatsworth Street, Detroit, Michigan to be a single-family residence.

19. BAKER electronically signed the PPP loan application as the CEO with 100% ownership on April 10, 2020.

20. All four 2019 941s were also signed by BAKER as CEO.

21. The loan package's Certificate of Completion was also signed by BAKER, on May 4, 2020.

22. On May 15, 2020, MA was interviewed by your Affiant. On May 11, 2020, MOTORCITY's MFCU XXXX1891 account received a $590,900 deposit from CUSTOMERS BANK. On May 11, 2020, BAKER purchased two cashier's checks from MFCU out of the MOTORCITY account. He also withdrew $30,000 in cash. On May 12, 2020, BAKER purchased two additional cashier's checks from MFCU, and withdrew $30,000 more in cash. MFCU saw the account had been inactive for a long time prior to these transactions and subsequently froze the account.

23. By review of MOTORCITY's MFCU account statements, I have determined that the account was opened on October 23, 2017. The account was active from October 23, 2017 to July 16, 2019, during which time the account activity did not appear to resemble payroll transactions or deposits or withdrawals related to solar energy. The account remained closed from July 16, 2019 to April 14, 2020. On April 14, 2020 money was paid to reopen the account. The account activity between April

14, 2020 and May 21, 2020 did not appear to resemble payroll transactions or deposits or withdrawals related to solar energy. MFCU closed the account on May 21, 2020.

24. None of the cashier's checks went to payroll; all four cashier's checks were made payable to TAS, an auto dealership in Redford, Michigan. MA provided the FBI with the check date, check number, and check amount for all four cashier's checks, summarized as:

| DATE | CHECK NO. | CHECK AMOUNT |
|---|---|---|
| 5/11/2020 | 2924765 | $ 37,590.30 |
| 5/11/2020 | 2924766 | $ 36,461.90 |
| 5/12/2020 | 2924905 | $ 14,234.20 |
| 5/12/2020 | 2924906 | $ 20,706.90 |

25. TAS also provided your Affiant with vehicle sales documents, including copies of purchase agreements and canceled checks, which documented BAKER's purchase of four vehicles. I have reviewed the documents. All four vehicles were purchased by checks issued from MFCU that were obtained by BAKER, summarized as:

| DATE | CHECK NO. | CHECK AMOUNT | VEHICLE PURCHASED | YEAR | VIN |
|---|---|---|---|---|---|
| 5/11/2020 | 2924765 | $ 37,590.30 | Cadillac Escalade | 2015 | 1GYS4NKJ7FR587893 |
| 5/11/2020 | 2924766 | $ 36,461.90 | Dodge Charger | 2018 | 2C3CDXGJ4JH220865 |
| 5/12/2020 | 2924905 | $ 14,234.20 | Hummer | 2007 | 5GRGN23UX7H103219 |
| 5/12/2020 | 2924906 | $ 20,706.90 | Cadillac Escalade | 2012 | 1GYS4KEF3CR128099 |

26. I spoke with AS, owner of TAS, and learned that BAKER purchased two vehicles for himself, one for his sister, and one for his brother-in-law. AS described BAKER as being the individual pictured in the driver's license obtained during the

7

vehicle sales transactions. BAKER told AS that he made the money to purchase the vehicles by selling N95 masks to "FEMA".

27. In the course of the investigation, I have learned that, in total, BAKER spent and/or withdrew approximately $172,000 of the loan proceeds from the MFCU account, none of which appeared to be spent on payroll. CUSTOMERS subsequently issued a Hold Harmless agreement to MFCU to freeze the remaining funds. CUSTOMERS then received a check from MFCU, dated May 21, 2020, returning the remaining loan proceeds in the amount of $418,415.60.

28. BAKER then sent an e-mail to KM of CUSTOMERS stating, "We are requesting that the funds that have been repossessed by your institution be returned to our account immediately so that we can continue in our business and honor our agreement."

## CONCLUSION

29. Your affiant submits that there is probable cause to believe that BAKER devised and perpetrated a scheme or artifice to defraud CUSTOMERS BANK. In furtherance of and to execute this scheme, BAKER sent an electronic loan application and other writings, signs, signals, and pictures in interstate commerce by means of wire communication, as set forth above. He received the proceeds of the loan via an electronic funds transfer wire that crossed state lines as well.

30. Further, your affiant submits that there is probable cause to believe BAKER engaged in monetary transactions through a financial institution while using the proceeds of his wire fraud scheme, , specifically by obtaining four cashier's checks issued by MFCU in amounts greater than $10,000, and using those checks to purchase four vehicles.

31. Therefore, your Affiant believes that probable cause exists that DARRELL LAMONT BAKER violated 18 U.S.C. §1343 (wire fraud) and 18 U.S.C. §1957 (money laundering).

MATTHEW SLUSS
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my
presence and/or by reliable electronic means.

Date: June 1, 2020

Hon. David R. Grand
United States Magistrate Judge
Eastern District of Michigan